# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| In Re: ) | |
| ) | **JUDGE RICHARD L. SPEER** |
| Sarah/Bradley Felske ) | |
| ) | Case No. 07-33014 |
| Debtor(s) ) | |
| ) | |

## DECISION AND ORDER

This cause comes before the Court on the Motion of the United States Trustee to Dismiss Case for abuse pursuant to 11 U.S.C. § 707(b)(1). The Debtors filed an objection thereto. A Hearing was then held on this matter after which time the Court took the matter under advisement so as to afford time to thoroughly consider the issues raised by the Parties. The Court has now had this opportunity, and finds, for the reasons now explained, that the Motion of the United States Trustee should be Granted.

### FACTS

On July 17, 2007, the Debtor, Sarah and Bradley Felske, filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code. The Debtors have three children, all under the age of 10. In their bankruptcy petition, the Debtors disclosed assets totaling $441,657.00 in value. The Debtors' principal asset is their residence, valued at $390,000.00. This property was constructed for the Debtors, beginning in 2006, with the Debtors moving into the property in January of 2007.

According to their bankruptcy schedules, the Debtors other assets of significance consist of two automobiles, a 1997 Ford Explorer and a 2000 Ford Explorer, worth together $8,475.00; a 1993 Boat and Trailer worth $8,500.00; Mr. Felske's 401(k) account with a market value of $11,000.00; and a retirement account held by Mrs. Felske with a value of $16,000.00. For assets, the Debtors also disclosed the possibility of a tax refund.

**In re Sarah/Bradley Felske**
**Case No. 07-33014**

Against their assets, the Debtors set forth secured debts in the amount of $387,838.37; priority, unsecured debts in the amount of $12,476.00; and unsecured, nonpriority debts in the amount of $132,425.45. The Debtors' secured debts consist of (1) a mortgage against their residence in the amount of $371,000.00; (2) a security interest against their boat in the amount of $6,701.00; and (3) security interests against their vehicles in the aggregate amount of $10,137.37. The Debtors, at the time they filed for bankruptcy relief, set forth in their petition an intent to reaffirm on all these secured debts. According to their bankruptcy schedules, the Debtors' unsecured, priority debts are comprised of tax liabilities in the amount $10,676.00, and a student loan of $1,800.00.[1] Finally, making up the Debtors' unsecured, nonpriority debts are significant credit-card obligations as well as obligations owed for supplies and services incurred in the construction of their new residence.

The Debtor, Mr. Felske, is a Database Administrator for the University of Toledo, a position which he has held for six months. Mr. Felske has also, on an intermittent basis, worked as a teacher for a local community college. The Debtor, Mrs. Felske, is an Analyst for a Fortune 500 company. Mrs. Felske has been with her present employer for 11 years.

As compensation from his employment, Mr. Felske, after making allowance for deductions, set forth a net monthly of between $4,020.44 and $4,255.94 per month, with the higher figure representing the additional funds he receives when teaching. For her income, Mrs. Felske, after accounting for deductions, including $788.55 due per month over the next two years for the

---

[1] Although not relevant in this matter, it is noted that, while they are generally nondischargeable debts, student-loan obligations are not actually priority debts under the Bankruptcy Code. 11 U.S.C. § 507 (listing priority debts); 11 U.S.C. § 523(a)(8) (providing for nondischargeability of student loans).

Page 2

In re Sarah/Bradley Felske
Case No. 07-33014

repayment of a 401(k) loan, set forth a net monthly income of $2,741.98. Based then on these figures, the Debtors claimed a household income of between $6,762.42 and $6,997.92.[2]

Against their income, the Debtors first set forth $7,205.59 in total necessary, monthly expenditures, thus leaving their household budget with a shortfall each month of between $207.67 and $443.17. These expenses included the following:

| | |
|---|---|
| Mortgage Payment | $3,016.00 |
| Utilities | $ 400.00 |
| Home Maintenance | $ 100.00 |
| Food | $ 800.00 |
| Transportation | $ 575.00 |
| Car Payments | $ 265.59 |
| Child Care | $ 751.00 |
| Tax Liabilities | $ 295.00 |
| Boat Payment and Insurance | $ 270.00 |
| Recreation | $ 150.00 |

The Debtors later revised their total necessary monthly expense figure upward by $139.00, to $7,344.59. In large part, this revision stemmed from three adjustments the Debtors made to their necessarily monthly expenses. First, the Debtors revised upward their childcare expense (which now

---

[2] For the record it is noted that Mrs. Felske set forth in her schedules a deduction of $409.00 for "Dependent Care" as well as a corresponding addition to her monthly income of $409.00 for "Dependent Care Reimbursement." As these two itemized exactly offset, they would appear to have no ultimate effect on the Debtors' net monthly income.

Page 3

In re Sarah/Bradley Felske
Case No. 07-33014

included home schooling classes) from $751.00 per month to $1,240.00. Conversely, the Debtors also lowered their recreation expense to $75.00 per month and eliminated their expenses for their boat, amounting to $270.00 per month, explaining that they now intended to surrender this property.

## DISCUSSION

The Motion of the UST to Dismiss is brought pursuant to 11 U.S.C. § 707(b)(1) which provides:

> After notice and a hearing, the court . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter.

It is the position of the UST that the Debtors' case should be dismissed for abuse under this provision because they have the ability to pay their unsecured debts. (Doc. No. 12).

In determining whether the granting of relief would be an abuse within the meaning of § 707(b)(1), two alternative standards are prescribed. First, in § 707(b)(2) it is provided that, under a 'means test' formula, abuse may be presumed in instances where an ability to pay threshold is exceeded. Second, § 707(b)(3) sets forth that, even if no presumption of abuse arises, a court may still dismiss a case based upon the particular circumstances of the case.

Based upon the UST's assertion that the Debtors have the ability to repay their debts, at issue in this matter is the applicability of § 707(b)(3). In particular, subparagraph (B) of § 707(b)(3) which provides:

> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider–

Page 4

**In re Sarah/Bradley Felske**
**Case No. 07-33014**

> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

By prescribing that abuse may be determined by reference to the 'totality of the circumstances,' this provision allows a court to conduct a subjective, case-by-case, analysis of a debtor's financial situation. *In re Wilson*, 356 B.R. 114, 121 (Bankr. D.Del. 2006). Whether, as argued by the UST, a debtor has the ability to repay their debts is a primary, although not the only consideration potentially bearing on whether the totality of the debtor's financial circumstances will be found to demonstrate abuse under § 707(b)(3).[3]

A frequently utilized measure, when determining whether a debtor has the ability to repay their debts, is to ascertain whether, under a hypothetical Chapter 13 repayment plan, the debtor could repay a meaningful percentage of his or her unsecured debts. *In re Behlke*, 358 F.3d at 434-35; *In re Glenn*, 345 B.R. 831, 836 (Bankr. N.D.Ohio 2006). In turn, whether a debtor would be able to make, under a Chapter 13 plan of reorganization, a meaningful remuneration to his or her unsecured

---

[3]

Citing to the decision rendered by the Sixth Circuit Court of Appeals in *In re Krohn*, 886 F.2d 123 (6th Cir. 1989), this Court has explained:

> When determining whether the dismissal of a Chapter 7 case is proper under the 'totality of the circumstances' standard of § 707(b)(3), a primary focus of the court will be on the debtor's 'need' for such relief. Where there is a want of need dismissal for abuse will be proper. A debtor's 'need' is broadly measured by looking to whether his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets. An often used indicator in this regard is whether, as argued by the UST, a debtor has the ability to repay their debts, particularly whether the debtor has the ability to fund a Chapter 13 plan of reorganization.

See *In re Wadsworth*, Ch. 7 Case No. 07-32407, 2007 WL 4365374 (Bankr. N.D. Ohio 2007) (internal citations and quotations omitted).

Page 5

**In re Sarah/Bradley Felske**
**Case No. 07-33014**

creditors is primarily contingent upon the amount of "disposable income" the debtor has available to pay into the plan. The term "disposable income" is defined, generally, as that income received by a debtor which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor. 11 U.S.C. § 1325(b)(2); *In re Pier*, 310 B.R. 347, 353 (Bankr. N.D.Ohio 2004).

Within this framework, the Debtors maintain that the UST's assessment of their ability to pay is facially incorrect, pointing to those budgetary figures provided in their amended schedules. These figures show that they have a shortfall in their household budget approaching as much as $500.00 per month. According to the Debtors, this deficit in their monthly budget stems primarily from "the loss of dividend income from investment in the housing market, coupled with the debtor's [sic] own home construction difficulties . . . ." (Doc. 18, at pg. 9).

As a purely evidentiary matter, an assessment of a debtor's 'disposable income' is not entirely dependent on those financial figures provided by the debtor. Rather, "in its role as the trier-of-fact, the Court is under a duty to scrutinize a debtor's expenses, and make downward adjustments where necessary, so as to ensure that the debtor's expenses are reasonable. Similarly, when determining a debtor's 'disposable income,' a court may impute income to the debtor when it would be equitable to do so–*e.g.*, when the debtor is voluntarily underemployed." *In re Gonzalez*, 378 B.R. 168, 173 (Bankr. N.D.Ohio 2007).

To this end, the UST put forth that the deficit in the Debtors' budget is based upon excessive expenditures which should not be allowed. Of particular concern, the UST took particular issue with two categories of the Debtors' current expenditures: (1) aggregate housing expenses of approximately $3,500.00 per month; and (2) the Debtors' allocation of substantial funds, approximately $800.00 per month, to repay Mrs. Felske's 401(k) loan. The propriety of both these categories of expenses has been previously addressed by the Court.

Page 6

In re Sarah/Bradley Felske
Case No. 07-33014

First, following Sixth Circuit precedent, this Court has held that, unless presented with a unique situation, it would not allow a debtor to commit a part of his or her earnings to the payment of their own retirement fund, whether by contribution or loan repayment, while at the same time paying their creditors less than a 100% dividend. *See, e.g., In re Glenn*, 345 B.R. 831, 837 (Bankr. N.D.Ohio 2006), *citing Harshbarger v. Pees (In re Harshbarger)*, 66 F.3d 775 (6th Cir.1995) and *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434-35 (6th Cir. 2004). Similarly, this Court has not viewed favorably debtors who seek to maintain expensive homes, by reaffirming on the underlying secured debt, while simultaneously seeking to discharge their voluntarily incurred unsecured obligations. As previously noted by the Court, bankruptcy is "meant to provide a debtor a fresh-start, but not a head start. Thus, when seeking bankruptcy relief, debtors may be expected to do some belt tightening, including, where necessary, foregoing the reaffirmation of those secured debts which are not reasonably necessary for the maintenance and support of the debtor and his family."*In re Wadsworth*, Ch. 7 Case No. 07-32407, 2007 WL 4365374 (Bankr. N.D.Ohio 2007) (internal citations omitted).

Based then upon these decisions, both of the points made by the UST are presumptively valid. Loan repayments to 401(k) accounts, such as that being made by Mrs. Felske, generally cannot be expensed against 'disposable income' for purposes of § 707(b)(3). Likewise, while reasonable housing expenditures will be allowed as a matter of course, the Debtors' allocation of $3,500.00 per month for housing is not outwardly reasonable. *See Id.* (case dismissed for abuse; allocating $2,646.00 for housing not reasonable); *In re Osborne*, Case No. 07-32263, 2008 WL 151294 (Bankr. N.D.Ohio 2008) (housing expenses of $3,611.00 are not ordinarily reasonable for two debtors who claim an inability to repay their debts).

Notwithstanding, promulgating absolute rules is inapposite to a § 707(b)(3)(B) 'totality of the circumstances' analysis which, by definition, requires that all aspects of a debtor's financial condition be considered. Thus, for example, in *In re Gonzalez*, this Court left open the possibility

Page 7

In re Sarah/Bradley Felske
Case No. 07-33014

that situations could arise requiring that a debtor be permitted to expense against their 'disposable income' contributions and/or loan repayments made to a retirement account. 378 B.R. 168, 174 (Bankr. N.D.Ohio 2007). Relying, then, on this malleability of § 707(b)(3), those points offered by the Debtors, regarding why their particular circumstances warrant deviating from those above-stated norms, are now considered.

First, the Debtors argue that seeking to maintain a $390,000.00 home at the expense of their unsecured creditors, including some creditors involved in the property's construction, is not extravagant considering that when they contracted for its construction, they were not experiencing financial difficulty. In this way, the Debtors ascribe much of their financial difficulties to a precipitance decline in an investment, in particular a MREIT,[4] and the attendant loss of income received from the investment.

Bankruptcy is often precipitated by an unexpected event which directly affects a debtor's income or expenses, or both – *e.g.*, the loss of a job, divorce and/or illness. A primary function of bankruptcy is to ameliorate the impact of such events, affording, in the words of the Supreme Court, to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh. . . ." *Williams v. U.S. Fidelity & Guar. Co.*, 236 U.S. 549, 554-555, 35 S.Ct. 289, 59 L.Ed. 713 (1915). At the same time, the fresh-start policy of the Bankruptcy Code, particularly Chapter 7 which is entitled 'Liquidation,' is not beholden to the retention of nonexempt property. Similarly, while bankruptcy relief is not conditioned upon a debtor living in poverty, it does envision a sacrifice on the part of the debtor. *In re Zaporski*, 366 B.R. 758, 773-74 (Bankr. E.D.Mich. 2007). Therefore, to equate an unexpected event, such as the Debtors' loss of investment income, as affording a right to retain property which is beyond that which is reasonably needed for maintenance and support, turns these basic bankruptcy policies upside down – providing the Debtors with a head-start as

---

[4] Mortgage Real Estate Investment Trust.

Page 8

**In re Sarah/Bradley Felske**
**Case No. 07-33014**

opposed to a fresh-start. *See In re Mooney*, 313 B.R. 709, 714-15 (Bankr. N.D.Ohio 2004) ("If the mortgage payment on that home is so large that a debtor falls behind in payments to other creditors, eventually seeking to discharge most of these debts in Chapter 7, while still keeping the house, this would be a substantial abuse of the provisions of Chapter 7.").

Moreover, as a practicable matter, investments always carry the risk of loss. In the Debtors' particular case, therefore, it seems highly irregular that, while having benefitted from the upside of their investment, they now seek to avoid those consequences (e.g., the loss of their home) which follow when their investment experiences a loss.

Having said all this, the arguments put forth by the Debtors also attack the basic premise that their housing expenses are, in fact, excessive. According to the Debtors, those resources expended to maintain their housing are necessary for the health and maintenance of their family and for the continued production of income. In support of this, the Debtors stated that Mrs. Felske "is allergic to among other things mold and dust – two things which are prevalent in older homes." And that their new "home was built on 100% poured concrete foundation as opposed to a crawl space which is prone to mold, mildew and dust, and with materials to limit the possibility of mold and dust." The Debtors also pointed out that their new home is conducive to home schooling their oldest child which they do for religious and academic reasons. (Doc. No. 18, at pgs. 5-6).

Yet, even taking the Debtors' statements at face value, and accepting the fact that the Debtors' $400,000.00 home offers certain amenities, there still remains an obvious question: do there exist any less expensive alternatives? Requiring a debtor to make such a showing is not too much to ask. Creditors should not be expected to pay for steak, when hamburger would do. Consequently, for purposes of § 707(b)(3), a debtor, when claiming the necessity of an expense beyond that which is normally permissible, must do more than show that the expense is necessary; the debtor must also show the lack of any reasonable alternative.

Page 9

**In re Sarah/Bradley Felske**
**Case No. 07-33014**

In this matter, no such showing was made and probably could not have been made. In this regard, the Court finds it hard to believe that allergen-free homes, similar to that now occupied by the Debtors, are not available for significantly less than $400,000.00. Likewise, numerous debtors, who home school their children, have appeared before this Court in homes worth less $400,000.00. In fact, if, as the Debtors argue, they are home-schooling their eldest child for religious and academic reasons, their convictions should completely overshadow any extra amenities that their present home may offer.

Finally, as it concerns their home, the Debtors put forth that their desire to reaffirm on the mortgage obligation stems from the reality that, if they were to sell the property, they would likely incur a deficiency against the mortgagee. Yet, even if this ultimately proves to be true, accepting this argument sets a bad precedent. Not only does it reward the Debtors for an improvident decision – purchasing a home which, even in the best of circumstances, consumed an inordinate amount of the Debtors' financial resources – it would be unfair to those debtors who were more prudent with respect to their financial decisions. As such, this Court will not be held hostage to the argument that the potentiality of a deficiency from a debtor's sale of collateral should militate against a dismissal under § 707(b)(3)(B). If a deficiency is incurred, it can be treated the same as any other unsecured debt.

Now switching gears, and turning to the position of the UST regarding the repayment of Mrs. Felske's 401(k) loan, the Debtors raised two separate points, one legal, one factual. First, as a legal matter, the Debtors put forth that this Court's previous holdings, whereby it disallowed the expensing of a 401(k) loan against 'disposable income' for purposes of § 707(b), are no longer valid in light of the decision of *Eisen v. Thompson*, 370 B.R. 762 (N.D.Ohio 2007), and the implementation of 11 U.S.C. § 1322(f).

Page 10

In re Sarah/Bradley Felske
Case No. 07-33014

Previously, in disallowing the expensing of 401(k) loans and contributions against 'disposable income,' this Court has relied, in part, upon the Sixth Circuit's holding in *Harshbarger v. Pees (In re Harshbarger)*, 66 F.3d 775 (6th Cir.1995). *See In re Oot*, 368 B.R. 662, 668 (Bankr. N.D.Ohio 2007). In *In re Harshbarger*, the Court held that, for purposes of confirming a Chapter 13 plan of reorganization, future payments made to an ERISA-qualified account must be treated "as part of the disposable income in the bankruptcy estate" *Id*. at 777. In *Eisen v. Thompson*, however, district-court judge, Dan Aaron Polster, from the northern district of Ohio, wrote that § 1322(f) expressly overruled *In re Harshbarger*. 370 B.R. at 771 fn.14.

Section 1322(f) provides that a Chapter 13 plan may not materially alter the terms of a loan against an ERISA-qualified account "and any amounts required to repay such loan shall not constitute "disposable income" under section 1325." This section, thus, as recognized in *Eisen v. Thompson*, allows a debtor, such as Mrs. Felske, formulating a Chapter 13 plan of reorganization to expense 401(k) loans against their 'disposable income.' The Debtors' attempt to equate this benefit with their particular situation, however, seeks to give both § 1322(f) and the decision of *Eisen v. Thompson* too far of a reach.

As an initial matter, the holding of *Eisen v. Thompson* is not strictly applicable to this case. The Court in *Eisen v. Thompson* was addressing the 'means test' of § 707(b)(2), not the 'totality of the circumstances' test of § 707(b)(3). What is more, at issue in *Eisen v. Thompson* was the applicability of an exception to the 'means test': whether, as held by the bankruptcy court, the repayment of a 401(k) loan fell within the ambit of § 707(b)(2)(B) which allows a debtor to rebut the presumption of abuse that may arise under § 707(b)(2) if there exists "special circumstances." The Court in *Eisen v. Thompson* held that it did not, also finding that the repayment of a 401(k) was not a debt for purposes of performing the 'means test' calculation.

Page 11

The Debtors have also taken the Court's statement in *Eisen v. Thompson*, regarding § 1322(f) overruling *Harshbarger*, out of context. Section 1322(f) is limited in its applicability to only those debtors seeking relief under Chapter 13 of the Bankruptcy Code; it is not applicable in a Chapter 7 case, including actions brought under § 707(b). 11 U.S.C. § 103. This was implicitly recognized in *Eisen v. Thompson* with the Court going on to hold that "[a]lthough § 1322(f) plainly overrules Harshbarger, the Court finds that the section does not have any impact on the . . . the means test . . . ." *Id.* at 771 fn.14.

In this way, if the Debtors wish to gain the benefit offered by § 1322(f) they must seek relief under Chapter 13, at which time the repayment of Mrs. Felske' 401(k) loan would not, in accordance with § 1322(f), constitute 'disposable income' for purposes of formulating a Chapter 13 plan. The basis for this disparate treatment – that of including 401(k) loans in a debtor's 'disposable income' when determining abuse under § 707(b)(3)(B), while allowing such an expenditure to be excluded from 'disposable income' in a Chapter 13 – was explained in *Eisen v. Thompson* as follows:

> Nor does newly amended § 1322(f) help the [debtors]. When enacting the 2005 Act, Congress added a clause providing that repayments of a 401(k) loan "shall not constitute 'disposable income' under section 1325." § 1322(f). The bankruptcy court asserts that, from a policy standpoint, it makes little sense that Congress would expressly exclude any amounts required to repay 401(k) loans from the definition of 'disposable income' under 11 U.S.C. § 1325, yet include such income for purpose of determining abuse under section 707(b). I disagree. Characterizing 401(k) payments as disposable income in a Chapter 13 proceeding makes sense because 401(k) loans are finite, and Chapter 13 proceedings are prospective. Because a 401(k) loan might be paid off within the commitment period of a Chapter 13 case, the Trustee would have the ability to direct newly available funds to creditors. Such is precisely the case here. The Trustee has shown that, if this case is converted into a Chapter 13 proceeding, the [debtors], whose last 401(k) loan payment will occur in November 2008, could repay over $21,000 to their unsecured creditors before the end of a five-year plan. Such an approach serves both the Congressional intent to protect retirement contributions and

Page 12

**In re Sarah/Bradley Felske**
**Case No. 07-33014**

> to ensure that debtors repay creditors an amount they can afford, a primary goal of the 2005 Act.

*Id.* at 777 (internal quotations and citations omitted). In this regard, Mrs. Felske's 401(k) loan perfectly fits this mold. The evidence presented to the Court shows that Mrs. Felske is scheduled to complete paying her 401(k) loan in approximately two years, after which time those funds would be available to fund a Chapter 13 plan.

The Court also does not accept the Debtors' contention that the only way Mrs. Felske can avoid repaying her 401(k) loan is to terminate her employment. No evidence was offered of this contention. Moreover, it would seem strange that a person would stand to lose their employment for not repaying a loan to themselves. In the final analysis then, the underpinnings of this Court's past holdings regarding 401(k) accounts in a Chapter 7 remain in this matter: it would be unfair to allow the Debtors to commit part of their earnings to the payment of their own retirement fund while at the same time paying their creditors less than a 100% dividend.

Based, therefore, on the foregoing discussion, the Debtors' 401(k) loan repayment of $788.55 per month will be considered 'disposable income' for purposes of determining abuse under the 'totality of the circumstances' test of § 707(b)(3)(B). Also, as explained, the Debtors will not be permitted to exclude from their 'disposable income' their entire housing expense of $3,500.00 per month. Although the Court is not at this time inclined to set forth a specific figure as to the amount the Debtors should be permitted for their housing, it is safe to say that the Debtors could, without jeopardizing their health and welfare, cut their monthly housing expenses in half. As a result, the Debtors have at their disposable significant sums to repay their creditors – perhaps as much as $2,500.00 per month. Taken over 60 months, the length of a Chapter 13 plan, this amounts to $150,000.00. Under nearly any measure, the availability of such financial resources necessitates that the Debtors make an attempt to pay, at least some, of their outstanding unsecured debt.

Page 13

**In re Sarah/Bradley Felske**
**Case No. 07-33014**

It is realized, as the Debtors pointed out, that they both have older cars which may entail the Debtors incurring future expenses for the vehicles' repair and/or replacement. But this concern is more than offset by the significant financial resources available to them, with the Debtors having a combined yearly salary of well over $100,000.00. Also offsetting this concern, the Debtors' employment situation appears relatively stable – especially as it concerns Mrs. Felske who has been with the same employer for 11 years.

Finally, and although not dispositive in this matter, the Court is troubled by a couple other aspects of this case. First, the Debtors initially set forth an intent to retain their boat, clearly a luxury expense. The Debtors' explanation that they did this in attempt to deal honestly with the creditor rings hollow. Besides the obvious disconnect this entails, it raises an interesting question: If the Debtors were truly motived by a desire to deal honestly with their creditors, then why did they not also seek to reaffirm on those debts arising from the goods and services they were extended on credit for the construction of their new home? With the Debtors filing for bankruptcy relief soon after the construction of their new home was completed, and with the Debtors seeking then to retain this property, it follows that the honest thing to do was reaffirm on such debts.

Second, the Debtors' assertion of what is presumably an ongoing shortfall in their monthly budget, concerns this Court. As a practicable matter, unless a debtor is utilizing exempt assets, the Court has yet to understand how a debtor can continuously operate with a shortfall in their household budget. Simple math holds that one generally cannot spend more than they make.

To be sure, a debtor's budget will generally reflect just those conditions which existed at the time the bankruptcy petition is filed. As a result, temporary shortfalls in a debtor's budget are possible and may be explained, for example, by yet to be implemented cost saving measures. But this is not the picture presented here, with the Debtors' seeking to reaffirm on their greatest expenditure: their $400,000.00 home.

Page 14

In re Sarah/Bradley Felske
Case No. 07-33014

Accordingly, for all these reasons, the picture presented here is one of two Debtors with the ability to pay their debts, but unable to presently do so because they are living beyond their means. As a consequence, the Court finds that, with respect to the 'totality of the circumstances' test of § 707(b)(3)(B), the filing of this case constituted an abuse for purposes of § 707(b)(1). In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

**ORDERED** that the Clerk, United States Bankruptcy Court, is directed to prepare for presentation to the Court an order of dismissal under 11 U.S.C. § 707(b)(1) if, at the opening of business on Monday, February 18, 2008, this case is still proceeding under Chapter 7 of the United States Bankruptcy Code.

***IT IS FURTHER ORDERED*** that, subject to the Debtors' election to convert this case, the Motion of the United States Trustee to Dismiss under 11 U.S.C. § 707(b)(1) and § 707(b)(3), be, and is hereby, GRANTED.

Dated: February 6, 2008

_____
Richard L. Speer
United States
Bankruptcy Judge

Page 15

# CERTIFICATE OF SERVICE

Copies were mailed this 6th day of February 2008 to:

Bowling Green State University
Office of the Bursar
PO Box 993
Bowling Green, OH 43420

Christopher J Klym
Huffman, Isaac & Klym, LLC
24441 Detroit Rd. #200
Westlake, OH 44145

Stacey A O'Stafy
Manley Deas & Kochalski LLC
PO Box 165028
Columbus, OH 43216-5028

Bradley Allen Felske
24291 Sun Air Blvd.
Perrysburg, OH 43551

Sarah Lynn Felske
24291 Sun Air Blvd.
Perrysburg, OH 43551

Amy E Stoner
520 Madison Ave, #545
Toledo, OH 4360

Scott D. Fink
Weltman, Weinberg & Reis Co., L.P.A.
323 W. Lakeside Avenue Suite 200
Cleveland, OH 44113

Beth Ann Schenz
Weltman, Weinberg & Reis Co., L.P.A.
323 West Lakeside Avenue, Ste. 200
Cleveland, OH 44113

Household Bank (SB) N.A.
Bass & Associates, P.C.
3936 E. Ft. Lowell Rd Ste #200
Tucson, AZ 85712

Patti H. Bass
3936 E. Ft. Lowell Rd.
#200
Tucson, AZ 85712

United States Trustee
H.M. Metzenbaum U.S. Courthouse
201 Superior Ave. Suite 441
Cleveland, Oh 44114

Dean Wyman ust03
Office of the US Trustee
Howard M. Metzenbaum U.S. Court House
201 Superior Aveneue, Suite 44114
Cleveland, OH 44114-1240

Louis J Yoppolo
1200 Edison Plaza
300 Madison Ave
Toledo, OH 43604-1556

/s/Jennifer S Huff
Deputy Clerk, U.S. Bankruptcy Court